UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| BISHOY BIBAWY, <br> *Plaintiff*, <br> v. <br> LOUIS DEJOY, <br> *Defendant*. | No. 3:20-cv-1137 (MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Bishoy Bibawy (the "Plaintiff" or "Bibawy") brings this action against his former employer, U.S. Postmaster General Louis DeJoy (the "Defendant" or "DeJoy"), alleging discrimination, failure to accommodate, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.* (the "Rehabilitation Act").  DeJoy has moved for summary judgment on all Bibawy's claims.  For the reasons set forth below, I grant the motion.

## II.  BACKGROUND

## A.  Facts

The following facts, which are drawn primarily from the parties' Local Rule 56(a) statements, are undisputed unless otherwise indicated.

## 1.  Bibawy's Employment with the Postal Service

Bibawy began working for the United States Postal Service (the "Postal Service") in April 2013, when he was hired as a mail handler assistant "for the overnight shift at the Hartford, Connecticut Processing and Distribution Center ("P&DC," or "Plant")."  Defendant's Local Rule 56(a)(1) Statement, Doc. No. 39-2 ("Def. 56(a)(1) Stmt."), ¶ 1.  Bibawy remained a full-time employee at the Hartford P&DC from 2013 to 2016.  Def. 56(a)(1) Stmt. ¶ 2.  In 2015, Bibawy

was promoted to an "acting supervisor."  Plaintiff's Local Rule 56(a)(2) Statement of Additional Material Facts, Doc. No. 49-2 ("Pl. 56(a)(2) Stmt. of Add'l Facts"), ¶ 2.  Bibawy also was diagnosed with depression around this time.  Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 3.  In 2016, Bibawy's position was "converted to a permanent…mail handler position."  Doc. No. 39-7, Def. Ex. D, at 6.[1]  Bibawy's "position of record" was a "Level-04 mail handler for the Hartford, Connecticut [P&DC]."  *Id.*

"As a result of an extended period away for an accepted [workplace] injury compensation case (May 2017 through October 2019)," Bibawy was unable to return to work due to mental health issues.  Def. 56(a)(1) Stmt. ¶ 3.  At his deposition, Bibawy testified that "his disability diagnoses stem[] from…having suffered PTSD, severe depression, panic attacks, agoraphobia, and major depressive disorder."  Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 19.  Bibawy claims that these symptoms were triggered by a hostile work environment at the P&DC.  Doc. No. 11 at 2 ¶ 6.

**2.      Bibawy's Return to Work and Requests for Accommodation**

Bibawy's physicians cleared him to return to work in October 2019, with restrictions.  Def. 56(a)(1) Stmt. ¶ 4, 5; Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 4.  Those restrictions, outlined in letters from one of Bibawy's doctors dated September 12, 2019, October 18, 2019, and November 7, 2019, were as follows:

- Bibawy "should not be placed at his previous work location," the Hartford P&DC. Doc. No. 39-9, Def. Ex. F, at 2, 3.
- He should not be placed "in a location where he may encounter any persons involved in the trauma he experienced" at the Hartford P&DC, such as in Wallingford.  Doc. No. 39-9, Def. Ex. F, at 3.
- His "future work location [should] be in close proximity to his place of residence and to his therapy office in New Haven."  Doc. No. 39-9, Def. Ex. F, at 2.  More specifically, his new placement should be within ten miles of, and no more than a ten- or fifteen-minute drive from, his place of residence and his therapy office in New Haven.  Doc. No. 39-9, Def. Ex. F, at 3.

---

[1]  The page numbers in record citations refer to ECF page numbers.

- He should be placed in a job "that requires minimal interaction with others." Doc. No. 39-9, Def. Ex. F, at 2, 3.[2]
- He should not be placed "in a position that requires him to remain at work for late night shifts." Doc. No. 39-9, Def. Ex. F, at 7.

These restrictions "prohibited [Bibawy] from working at the Hartford plant in his former position as a Level-04 mail handler." Def. 56(a)(1) Stmt. ¶ 25.[3]

## 3. The November 8, 2019 DRAC Meeting

After Bibawy was cleared by his doctors to return to work in October 2019, he filed a request for reasonable accommodation with the Postal Service, which was referred by the health and resource manager to Pauline Meacham ("Meacham"), the Chair of the District's Reasonable Accommodation Committee ("DRAC") on October 31, 2019.  Def. 56(a)(1) Stmt. ¶¶ 6, 99.

An interactive meeting between Bibawy, Meacham, and the DRAC "was held on November 8, 2019, to address the Plaintiff's request for a reasonable accommodation."  Def. 56(a)(1) Stmt. ¶ 6.

Meacham met Bibawy for the first time at the DRAC meeting, was unaware of his personnel file, and had "not observed [him] perform his job duties, but [was] aware of the standard position description for his position as a Mail Handler Level 4."  Def. 56(a)(1) Stmt. ¶¶ 94-96.  Bibawy concedes that "Meacham first became aware of [his] request for a reasonable accommodation regarding his return to the employ of the Postal Service [no earlier than] October 31, 2019."  Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 41.

The parties dispute when, exactly, Meacham became aware of Bibawy's race, national origin, religion, skin color, and the nature of his medical conditions, Def. 56(a)(1) Stmt. ¶¶ 31-33; Plaintiff's Local Rule 56(a)(2) Statement, Doc. No. 49-2 ("Pl. 56(a)(2) Stmt."), ¶¶ 31-33, but

---

[2] The September 19, 2019 letter suggested that a position involving "paperwork or computer responsibilities" was appropriate.  Doc. No. 39-9, Def. Ex. F, at 2.

the record shows that Meacham became aware of the circumstances leading to Bibawy's work restrictions during the November 2019 interactive meeting, where Bibawy explained the incident that took place at the Hartford P&DC in 2017, Doc. No. 39-18, Def. Ex. O, at 40-41, and Meacham observed Bibawy's skin color ("Based on observation, the complainant appears to be brown in color.") and accent ("Based on his accent, I surmise that he is from the Middle East."), Doc. No. 39-12, Def. Ex. I, at 3.

During the November 8, 2019 meeting, the parties discussed the medical restrictions imposed by Bibawy's physicians.  Def. 56(a)(1) Stmt. ¶ 59.  For instance, Bibawy cited a restriction from his doctor that "he could only work during the day and that his medication regimen requires a job with workhours that are between 7:00 a.m. and 6:00 p.m."  Def. 56(a)(1) Stmt. ¶ 9.  Bibawy also raised additional restrictions not mentioned in the letters from his physicians during the interactive meeting, such as:

- He could not use public transportation.  Def. 56(a)(1) Stmt. ¶ 11.
- He could not enter or use a bathroom other than his home bathroom.  Def. 56(a)(1) Stmt. ¶ 11.[4]
- He could not be in a room with more than six people.  Def. 56(a)(1) Stmt. ¶ 59.

When discussing at his deposition a December 3, 2019 letter from Meacham that recounted the November 2019 DRAC meeting, Bibawy confirmed the accuracy of the letter's summary of his medical restrictions: that he should not work at the Hartford P&DC; that he should not work in any location where there would be employees who were working at the Hartford P&DC when Bibawy was working there; that he should work within ten minutes from his residence and his health care providers; that he should not work in any location that required him to drive longer than 10 or 15 minutes one way; that he should be in a job that allows for

---

[4] Bibawy did not contest this, but he testified in his deposition that he can use a bathroom that isn't his own if it doesn't smell like chemicals.  Doc. No. 39-17, Def. Ex. N, at 59-60.

minimal interaction with others; that he must be able to leave work for weekly medical appointments; and that he should not work late-night shifts.  Def. 56(a)(1) Stmt. ¶ 59.  Bibawy elaborated that "minimal interaction with others" meant that he could not be in a room with more than six people, that he needed work hours between 7:00 am and 6:00 pm to be able to see his doctors if needed, and that he needed to be able to leave work immediately and get to his doctor's office within 10 to 15 minutes.  Def. 56(a)(1) Stmt. ¶ 59; *see also, e.g.*, Def. 56(a)(1) Stmt. ¶ 104.  Bibawy also "cannot be" in crowded places.  Def. 56(a)(1) Stmt. ¶ 64.

At the November 8, 2019 DRAC meeting, there was also discussion of potential jobs for Bibawy.  For example, Meacham mentioned some open IT positions that were "[p]robably out of state," so they did not conform with Bibawy's restrictions.  Doc. No. 39-17, Def. Ex. N, at 75; *see also* Def. 56(a)(1) Stmt. ¶ 75.  Bibawy testified that he was willing to go to school to learn the job if he was offered an IT position in Connecticut that met his restrictions.  Doc. No. 39-17, Def. Ex. N, at 75.  Bibawy also expressed an interest in working at a post office in the New Haven area; however, Meacham testified that there were no open positions there.  Def. 56(a)(1) Stmt. ¶ 108.[5]  Meacham also "attempted to discuss custodial positions with Bibawy" during the meeting.  Def. 56(a)(1) Stmt. ¶ 104.  Bibawy "rejected the DRAC's suggestion of a custodial job because the smell of the chemicals can increase his anxiety and make him sick."  He further rejected a proposed adjustment that the Postal Service switch to milder cleaning supplies, testifying that "'chemical is chemical.'"  Def. 56(a)(1) Stmt. ¶ 57.

---

[5] Bibawy does not agree with Meacham's claim that an audit found that the New Haven office was overstaffed, and believes that Meacham's statement was "nothing more than an excuse so the Postal Service would not have to hire him back to a position that conformed to his restrictions."  Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 10.

4.      **Confirmed Correspondence Between Meacham and Bibawy**

Following the DRAC meeting, Meacham continued to correspond with Bibawy regarding available positions, "but, according to [the] Plaintiff, none were compatible with his restrictions." Def. 56(a)(1) Stmt. ¶ 48.  For instance, at Bibawy's request, Meacham sent Bibawy a list of open "administrative assistant and secretary positions" and their descriptions, as well as information regarding a "residual mail handler position open in Milford, CT."  Doc. No. 39-7, Def. Ex. D, at 5.  "Meacham testified that although [the] Plaintiff was interested in jobs that were a ten-minute drive from his home, [she also] sent him all open, vacant funded positions in the whole Connecticut Valley district, which included the state of Connecticut, western Massachusetts, and Rhode Island, for his consideration."  Def. 56(a)(1) Stmt. ¶ 106.  Bibawy testified that none of the vacant jobs Meacham sent him "were designed to accommodate any of his medical restrictions, which frustrated [him]."  Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 11.

Meacham wrote to Bibawy on December 3, 2019 that "there was no reasonable accommodation available within his stated restrictions, and she provided him with a list of 27 open positions for which the Agency was hiring."  Def. 56(a)(1) Stmt. ¶ 13.  The letter also advised Bibawy that he was required to register for and submit requests for reassignment through the organization's "eReassign" system.  Def. 56(a)(1) Stmt. ¶ 14.  Bibawy responded to Meacham's letter on December 6, 2019, stating that none of the open positions conformed with his restrictions or his employment category, but that he could do "the open mail[]handler position on the list for the Milford Post Office if its workhours [which were from 1:00 am to 9:30 am] were changed."  Def. 56(a)(1) Stmt. ¶ 15.

Meacham reminded Bibawy in a letter dated December 17, 2019 that in order for the Agency "to act on a position he identifies," he needed to register in eReassign, and stated that he

had not yet done so.  Def. 56(a)(1) Stmt. ¶ 16.  "The December 17, 2019 letter [from Meacham]

went into detail about everything the Agency had done to try to identify and provide a position

which [the] Plaintiff would be able to perform with or without reasonable accommodation."  Def.

56(a)(1) Stmt. ¶ 17.  In the letter, Meacham also communicated to Bibawy that the hours for the

Milford mail handler position could not be changed because "they need the mail[]handler at

work [during] overnight hours because this is when mail is being processed" for delivery, Def.

56(a)(1) Stmt. ¶ 18; *see also* Doc. No. 39-7, Def. Ex. D, at 14, and also that the position would

not comply with his "minimal interaction with others" restriction, Doc. No. 39-7, Def. Ex. D, at

14, as "there would be far more than six people throughout the building," Def. 56(a)(1) Stmt. ¶

18.

     Bibawy filed an updated request for reasonable accommodation (a RAC Form A) and a

supporting RAC Form B Medical Information and Restriction Assessment in December 2019

and January 2020.  Def. 56(a)(1) Stmt. ¶ 19; Doc. No. 39-7, Def. Ex. D, at 19.  In response,

Meacham wrote to Bibawy on January 9, 2020 "that there was nothing new or different in these

recent submissions, but that if he disagreed, he was to contact her directly so that a second

interactive meeting could be scheduled for him."  Def. 56(a)(1) Stmt. ¶¶ 20, 82.  Indeed, Bibawy

testified that during the time period between December 2019 and January 2020, his medical

restrictions had not changed.  Def. 56(a)(1) Stmt. ¶ 81.[6]  Meacham's January 9th letter also

"included a list of 11 new job openings."  Def. 56(a)(1) Stmt. ¶ 20.  Bibawy informed Meacham

---

[6] At his deposition, Bibawy testified that since March 2020, when his DRAC process was closed out, he has been
feeling less stress and anxiety.  Doc. No. 39-17, Def. Ex. N, at 93-94; *see also* Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 20.
Although Bibawy is aware that he can re-open his DRAC case, Def. 56(a)(1) Stmt. ¶ 91, it is unclear whether this or
any other information about improvements in his mental health, *see* Doc. No. 39-17, Def. Ex. N, at 93-96; Pl.
56(a)(2) Stmt. of Add'l Facts ¶¶ 21, 22, was communicated to the Postal Service to reopen the DRAC process, and
Bibawy did not contest that "he does not have any updated medical restriction[s] or documentation to submit," Def.
56(a)(1) Stmt. ¶ 91.

that none of the positions conformed with his restrictions.  Def. 56(a)(1) Stmt. ¶ 83.  This was

the last time he spoke with Meacham.  Def. 56(a)(1) Stmt. ¶ 84.[7]

Around a month later, on February 3, 2020, Meacham sent Bibawy another letter, this

time with a list of 43 new job openings.  Def. 56(a)(1) Stmt. ¶ 21.  Bibawy did not respond to

this letter.  *See* Def. 56(a)(1) Stmt. ¶ 22; Doc. No. 39-7, Def. Ex. D at 37.  Because Bibawy

"failed to respond to the letters that included open positions…Meacham sent [him] a closing

letter on March 3, 2020."  Def. 56(a)(1) Stmt. ¶ 22.  The March 2020 closing letter stated that if

his circumstances were to change, "he could request that his case with the [D]RAC be

reopened," and that Meacham would gladly do so.  Def. 56(a)(1) Stmt. ¶ 23.  "Meacham closed

the Plaintiff's DRAC case after the 60-day job search was over and there had been no reasonable

accommodation identified for the employee."  Def. 56(a)(1) Stmt. ¶ 102.  Bibawy did not appeal

the DRAC close-out letter "because he 'want[ed] to start the lawsuit,'" Def. 56(a)(1) Stmt. ¶ 87.[8]

### 5.    The Milford Mail Handler Position

"Meacham testified that out of all of the positions [she] sent to [the] Plaintiff for his

consideration, the only job [he] expressed interest in was the Milford mail[]handler position."

Def. 56(a)(1) Stmt. ¶ 107; *see also* Def. 56(a)(1) Stmt. ¶ 100.  Bibawy states that he "expressed

[a] strong interest in the mail handler's position available in the Milford office, if the hours could

be reset."  Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 12.

"Since at least as far back as 2007, mail[]handler staffing for the Milford, CT Post Office

has consisted of one mail[]handler, who is a PS Level-04 mail[]handler…The mail[]handler's

---

[7] Although he does not indicate when he did so, Bibawy also testified that he sent Meacham a short statement "that
he was willing to work."  Def. 56(a)(1) Stmt. ¶ 86.
[8] Bibawy testified that he never asked to have the process opened again "because nobody told him it could [be]
reopened again," Def. 56(a)(1) Stmt. ¶ 88.  However, the Defendant points out, and Bibawy does not contest, that
Meacham's March 2020 closing letter explained that his case could be reopened if his situation changed.  Def.
56(a)(1) Stmt. ¶ 23; Pl. 56(a)(2) Stmt. ¶ 23.

work hours were and are from approximately 1:00 a.m. to 9:30 a.m." Def. 56(a)(1) Stmt. ¶ 37. "Between 2:50 a.m. and 7:05 a.m., approximately 100% of the mail to be delivered that day arrives at the office. The mail is off-loaded by the mail[]handler, who moves it onto the workroom floor and to its staging area(s), where it is sorted by clerks and distributed by them to letter carriers who will deliver the mail that particular day." Def. 56(a)(1) Stmt. ¶ 40. "The letter carriers' start time is 7:30 a.m. The carriers ready their mail that is to be delivered that day and leave the office to deliver it within approximately one hour of their start time. All mail meant for delivery that day is taken to the street by the carriers assigned to their respective routes." Def. 56(a)(1) Stmt. ¶ 41. "The workhours for the mail[]handler for the Milford Post Office are based on operational need, as shown by the IOP Map, to move the mail when it arrives at the delivery unit, so that the carriers can deliver it the same day." Def. 56(a)(1) Stmt. ¶ 44.

"[Bibawy] testified that he was told that there was only one mail-handler position in Milford at that time." Def. 56(a)(1) Stmt. ¶ 69. He also testified "that the mail-handler position that was open in Milford, Connecticut was a Level 4 position and that he was a Level 4 mail-handler when he left the Hartford PD&C." Def. 56(a)(1) Stmt. ¶ 70.

The parties agree that "[t]he Milford Post Office Position was for a night shift as a mail handler, working with up to eighty other employees at a time, which [did not comply] with the Plaintiff's medical restrictions." Def. 56(a)(1) Stmt. ¶ 34; Pl. 56(a)(2) Stmt. ¶ 34. The parties also agree that "[o]ne of the goals of the [P]ostal [S]ervice is to get the mail out on time." Def. 56(a)(1) Stmt. ¶ 74; Pl. 56(a)(2) Stmt. ¶ 74. However, they disagree about whether the work hours for the position could be switched to morning hours. Def. 56(a)(1) Stmt. ¶¶ 35-36; Pl. 56(a)(2) Stmt. ¶¶ 35-36.

Bibawy spoke with Meacham about the Milford mail handler position during the DRAC meeting and requested that the hours be changed from the night shift to the day shift.  Def. 56(a)(1) Stmt. ¶ 55.  Meacham informed Bibawy that Milford couldn't hire a mail handler who worked during the day "because they needed it more at night."  Def. 56(a)(1) Stmt. ¶ 75; *see also* Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 43.  Bibawy testified at his deposition that the position was not necessarily a nighttime job, Def. 56(a)(1) Stmt. ¶ 72, and that the work of the Milford position could be accomplished between 6:00 a.m. until 8:30 a.m. when the letter carriers leave, Def. 56(a)(1) Stmt. ¶ 93; *see also* Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 13 (According to Bibawy, based on his "experience as a supervisor and mail handler," "the Postal Service requires the services of mail handlers more than just during the night shift; mail handlers are needed 24 hours out of the day.").  Meacham testified that the only office she knew of that processed the mail during the day was the Hartford P&DC.  Def. 56(a)(1) Stmt. ¶ 98.[9]  Bibawy ultimately did not apply in eReassign for the Milford mail handler position because of the nighttime work hours requirement.  Def. 56(a)(1) Stmt. ¶¶ 79, 80, 103; Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 15.

6.    **Bibawy's Discrimination Claims**

Bibawy alleges that the acts of discrimination occurred on December 3, 2019, January 9, 2020, and February 3, 2020, the dates he received letters from Meacham "that offered him open, vacant, and available jobs.  [Bibawy] believes he was discriminated against because none of those jobs complied with his medical restrictions."  Def. 56(a)(1) Stmt. ¶ 49.  In other words, Bibawy alleges that "Meacham discriminated against him because she did not locate him a job within his restrictions."  Def. 56(a)(1) Stmt. ¶ 51.

---

[9] Bibawy disagrees, Pl. 56(a)(2) Stmt. ¶ 98, but the deposition testimony he cites does not suggest that there were other offices that processed mail during the day.  *See* Doc. No. 39-17 at 71-74.

Bibawy testified that he believes that the Postal Service retaliated against him during the DRAC process due to his prior EEO activity and an earlier lawsuit he brought against the Postal Service, and discriminated against him on the basis of his disability, religion, national origin, and race.  Doc. No. 39-17, Def. Ex. N at 37-39.  The "Plaintiff's complaint about the Postal Service and DRAC Chair Meacham is that 'they should have did the -- as much as they could from effort to create a special accommodation for me even if they couldn't create a new job that match my restriction.  But, again, they are just discriminating against my disability.  They don't want me to have a job and they don't want me to feel better as I want to.'"  Def. 56(a)(1) Stmt. ¶ 62.

## B.    Procedural History

Prior to initiating this action, Bibawy filed and settled a separate lawsuit with the Postal Service.  *See Bibawy v. Brennan*, Dkt. No. 18-cv-1195 (JAM).  As relevant here, the settlement agreement resolving that case, which was executed on February 5, 2020, Doc. No. 39-6, Def. Ex. C at 7, included the following language:

> In return for the considerations included in this Stipulation, PLAINTIFF hereby forever waives and releases DEFENDANT and the United States Postal Service and/or any present or former the United States Postal Service employees (including directors, employees, agents, affiliates, officers, enlisted personnel, civilian employees, or other employees) in their official or individual capacities, from any and all claims, issues, complaints, actions or appeals of any kind, including, but not limited to claims for damages, attorney's fees and/or costs which he presently has, or which he might have against them, up to and including the date of the execution of this stipulation. This release includes, but is limited to, any pending civil action, EEO or MSPB claims, and any grievances pursuant to the applicable collective bargaining agreement that have arisen as a result of the claims in this action.

*Id.* at 4 ¶ 6.

In this case, Bibawy filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on February 19, 2020, Def. 56(a)(1) Stmt. ¶ 26, and received a final decision from the EEOC, which included a notice of right to sue, on July 16, 2020, *id.* at ¶ 28.

Bibawy then commenced this action on August 10, 2020 with the filing of his Complaint.  Doc. No. 1.

Bibawy's Amended Complaint, the operative complaint in this case, was filed on October 26, 2020.  Doc. No. 11.  In it, Bibawy raises three claims: Count One states a Title VII claim alleging discrimination based on race, national origin, and religion.  Doc. No. 11 at 1-4.  Count Two charges DeJoy with violating the Rehabilitation Act based on allegations of discrimination due to the Plaintiff's physical and mental disabilities and a denial of his requests for accommodation.  *Id.* at 4-5.  Count Three alleges retaliation in violation of both Title VII and the Rehabilitation Act.  *Id.* at 6-7.  DeJoy filed his Answer, which raised several affirmative and other defenses, on November 5, 2020.  *See* Doc. No. 12.  After completing discovery, DeJoy moved for summary judgment on all Bibawy's claims.  Doc. No. 39.

## III.    LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  In reviewing the evidence, the court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks omitted).

"Where the moving party demonstrates 'the absence of a genuine issue of material fact,' *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the

opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). More specifically, it 'must do more than simply show that there is some metaphysical doubt as to the material facts,' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and 'may not rely on conclusory allegations or unsubstantiated speculation,' [*F.D.I.C. v.*] *Great Am. Ins. Co.*, 607 F.3d [288,] 292 [(2d Cir. 2010)]. Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## IV.    DISCUSSION

### A.    Release

The Defendant argues that "summary judgment should enter on the entirety of the Amended Complaint," ECF No. 39-1 at 15, due to an "accord and satisfaction" of Bibawy's claims in the previous lawsuit. *Id.* at 14. While the Defendant labels this argument "accord and satisfaction," it is better understood as one of "release," because it is based on the terms of the settlement agreement that resolved an earlier lawsuit between the parties.[10] The Defendant failed to raise either an "accord and satisfaction" or "release" defense, which are both affirmative defenses, Fed. R. Civ. P. 8(c)(1), in his Answer to Bibawy's Amended Complaint. *See generally* Answer, Doc. No. 12. Ordinarily, "a failure to plead an affirmative defense results in a waiver,"

---

[10] At common law, an "accord and satisfaction" referred to a procedure initiated by a debtor to resolve a disputed debt. "When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim. Such a contract is often initiated by the debtor, who offers an accord by tendering a check as 'payment in full' or 'in full satisfaction.' If the creditor knowingly cashes such a check, or otherwise exercises full dominion over it, the creditor is deemed to have assented to the offer of accord. Upon acceptance of the offer of accord, the creditor's receipt of the promised payment discharges the underlying debt and bars any further claim relating thereto…." *Cnty. Fire Door Corp. v. C.F. Wooding Co.*, 202 Conn. 277, 281 (1987).

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 526 (2d Cir. 2004) (quotation marks omitted), but Bibawy did not raise this issue and waiver arguments can themselves be waived. *See, e.g.*, *Noel v. New York State Off. of Mental Health Cent. New York Psychiatric Ctr.*, 361 F. App'x 196, 197 (2d Cir. 2010).

In any event, I agree with Bibawy that the settlement agreement from his prior case does not unambiguously bar him from bringing this action.  Although the agreement includes some broad release language, it also states that "[t]his release includes, *but is limited to*, any *pending* civil action, EEO or MSPB claims, and any grievances pursuant to the applicable collective bargaining agreement that have arisen as a result of the claims in this action."  Doc. No. 39-6, Def. Ex. C, at 4 ¶ 6 (emphasis added).  The parties executed this agreement on February 5, 2020. *Id.* at 7.  Neither this action nor the Plaintiff's EEOC complaint related to this action was "pending" as of that date.  Because the release does not unequivocally apply to this action, I cannot grant summary judgment on this basis.

**B.     Title VII Claim**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  In his complaint, Bibawy asserted a claim of Title VII discrimination on the basis of his race, religion, and national origin.  Pl. Am. Compl., Doc. No. 11 at 1-4.  Despite being presented with a summary judgment motion seeking to dismiss all three of the claims raised in his complaint, including his Title VII discrimination claim, Bibawy failed to address the Defendant's motion as to that claim in any way.  Furthermore, I agree with the Defendant that there is no evidence in

the record suggesting discrimination on the basis of the Plaintiff's protected status under Title VII.  Doc. No. 39-1 at 31.

"Where, as here, a counseled non-moving party submits 'a partial response arguing that summary judgment should be denied as to some claims while not mentioning others,' that response 'may be deemed an abandonment of the unmentioned claims.'"  *Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) (quoting *Jackson v. Federal Express*, 766 F.3d 189, 195 (2d Cir. 2014)).  "Even '[w]here abandonment by a counseled party is not explicit,' a court may infer abandonment 'from the papers and circumstances viewed as a whole.'"  *Id.* (quoting *Jackson*, 766 F.3d at 196).  As the Defendant points out, Bibawy has failed to point to "any evidence of discriminatory animus" or address the Defendant's argument that there is no such evidence.  Doc. No. 53 at 6.  Therefore, the Defendant is entitled to summary judgment on Bibawy's Title VII discrimination claim.

## C.    Rehabilitation Act Claims

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."  29 U.S.C. § 794(a).

"To prevail on a claim under the Rehabilitation Act, '[the Plaintiff] must establish that (1) [he] is an individual with a disability within the meaning of the Act, (2) [he] is otherwise qualified to perform the job in question, (3) [he] was excluded from the job solely because of h[is] disability, and (4) h[is] employer received federal funding.'"  *Silver v. Entergy Nuclear Operations, Inc.*, 290 F. Supp. 3d 234, 250 (S.D.N.Y. 2017) (quoting *Borkowski v. Valley Cent.*

*Sch. Dist.*, 63 F.3d 131, 135 (2d Cir. 1995)).  A "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).[11]  A court is required to give "consideration…to the employer's judgment as to what functions of a job are essential."  42 U.S.C. § 12111(8).  Furthermore, "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  *Id.*  "Indeed, a court must give substantial deference to an employer's judgment as to whether a function is essential to the proper performance of a job."  *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 98 (2d Cir. 2009).

In support of his Rehabilitation Act claims, Bibawy makes much of the first prong of the analysis, which asks whether he is an individual with a disability within the meaning of the Rehabilitation Act.  For instance, Bibawy spends several pages of his brief insisting that "[i]t is an undisputed fact that the Plaintiff has presented record evidence from his physicians in support of his claim of disability."  Doc. No. 49-1 at 17; *see also id.* (the "Defendant may dispute the conclusions of the Plaintiff's medical providers, but that question of whether Bibawy is disabled must be presented to a jury.").

But the Defendant does not contest that Bibawy is disabled.  Instead, the "Defendant argued [in his opening brief] that [the] Plaintiff [could not] satisfy the *second prong* [of the

---

[11] I recite the definition of a "qualified individual" from the ADA because "the standards for actions under…the ADA and the Rehabilitation Act are generally equivalent…."  *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015); *see also, e.g.*, *Fulton v. Goord*, 591 F.3d 37, 43–44 (2d Cir. 2009) (recognizing same); *Williams v. MTA Bus Co.*, 44 F.4th 115, 129 (2d Cir. 2022) ("Section 504 of the Rehabilitation Act echoes [the provision in the ADA] that only an 'otherwise qualified individual' can sustain a discrimination claim under that section.").

analysis][—]that he could not perform the essential functions of his position." Doc. No. 53 at 4 (emphasis in original). Bibawy failed to respond to this argument with admissible evidence, and, further, the evidence in the record demonstrates that Bibawy *could not* perform the essential functions of the Milford mail handler position, the only available position in which he expressed an interest.

Under the Rehabilitation Act, an employer is not, as Bibawy suggests, *see, e.g.*, Def. 56(a)(1) Stmt. ¶ 62; Pl. 56(a)(2) Stmt. of Add'l Facts ¶ 10, "obliged to create a new position to accommodate the employee." *Micari v. Trans World Airlines, Inc.*, 205 F.3d 1323 (2d Cir. 1999) (Mem.) (internal quotation marks and alteration omitted). As for positions that *were* available to Bibawy, the written description of the Milford job included a work hours requirement of 1:00 am to 9:30 am. Def. 56(a)(1) Stmt. ¶ 15; Pl. 56(a)(2) Stmt. ¶ 15. Meacham explained to Bibawy that there was a business need for those hours: to ready the mail for delivery that same day. *Id.* at ¶ 18; *see also* Doc. No. 39-1 at 27 ("During the night shift, the mail[]handler is needed to prepare that mail for the morning shift employees to deliver the mail. If the position was changed to the day shift, all that incoming mail would be curtailed until the following day, degrading on-time delivery."). The Defendant explains, and Bibawy does not dispute, that the Milford mail handler's work occurs at night:

> Between 2:50 a.m. and 7:05 a.m., approximately 100% of the mail to be delivered that day arrives at the office. The mail is off-loaded by the mail[]handler, who moves it onto the workroom floor and to its staging area(s), where it is sorted by clerks and distributed by them to letter carriers who will deliver the mail *that particular day*.

> The letter carriers' start time is 7:30 a.m. The carriers ready their mail that is to be delivered that day and leave the office to deliver it within approximately one hour of their start time...

Def. 56(a)(1) Stmt. ¶¶ 40-41 (emphasis added).  Bibawy does not dispute these facts, Pl. 56(a)(2) Stmt. ¶¶ 40-41, which leaves him little room to contest the Defendant's argument that working nighttime hours was an essential function of the job.

Bibawy nonetheless contends, without pointing to any evidence other than his own beliefs, that the Milford position could be switched to morning hours to accommodate his work hours restriction.  *See* Pl. 56(a)(2) Stmt. ¶¶ 35-36.  He does not explain how such a change would avoid compromising the Postal Service's on-time delivery of the mail, and he does not contest that I must "give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position."  *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998).  But even setting aside the night work hours requirement, Bibawy could not perform the essential functions of the job for an entirely different reason: because "there would be far more than six people throughout the building" at the Milford location, Def. 56(a)(1) Stmt. ¶ 18, which would have conflicted with his stated "minimal interaction with others" restriction, *id.* at ¶ 8; *see also* Def. 56(a)(1) Stmt. ¶ 34; Pl. 56(a)(2) Stmt. ¶ 34.[12]  Therefore, Bibawy was not "qualified" for this position within the meaning of the Act.

As for the other positions discussed throughout the DRAC process, Bibawy conceded that his impairments prevented him from performing the essential functions of his previous position as a Level-4 mail handler at the Hartford P&DC.  Def. 56(a)(1) Stmt. ¶ 60; Pl. 56(a)(2) Stmt. ¶ 60.  The IT positions he expressed an interest in were "promotion[s]," *see* Doc. No. 39-7, Def. Ex. D, at 8, which the Postal Service was not required to make, *see McBride*, 583 F.3d at

---

[12] In his Local Rule 56(a)(2) statement, Bibawy denies that "minimal interaction" meant that he could not be in the same work area as six or more people, but the excerpt from his deposition that he points to does not support this denial.  Pl. 56(a)(2) Stmt. ¶ 8 (citing Doc. No. 39-17 at 45 (p. 44 of Bibawy's deposition transcript)).  And elsewhere in his deposition, Bibawy testified that "minimal interaction" meant that he could not work in "a room with six or more people."  Def. 56(a)(1) Stmt. ¶ 59; Pl. 56(a)(2) Stmt. ¶ 59; Doc. No. 39-17 at 58.

98, and, even if Bibawy was technically qualified for those positions, his proximity restrictions would have prevented him from traveling out of state, an essential function of the job, Def. 56(a)(1) Stmt. ¶ 75; Pl. 56(a)(2) Stmt. ¶ 75.

As in *McBride*, Bibawy "has presented no evidence that, at or about the time of [his request for accommodation], there existed a vacant position at [the Postal Service] for which []he was qualified and reassignment to which would not have involved [his] promotion." *Id.* at 99. Further, he has conceded that he failed to engage in the DRAC interactive process almost entirely. *See, e.g.*, Def. 56(a)(1) Stmt. ¶¶ 20 (the "Plaintiff failed to respond to [Meacham's January 9, 2019] letter."); 22 ("Since [the] Plaintiff failed to respond to the letters that included open positions…Meacham sent [the] Plaintiff a closing letter on March 3, 2020."); Pl. 56(a)(2) Stmt. ¶¶ 20, 22.

Bibawy's failure to point to evidence in the record showing that he could perform the essential functions of an open position also forecloses his failure to accommodate claim under the Rehabilitation Act. "To establish a prima facie case of discrimination based on an employer's failure to accommodate a disability, under…the Rehabilitation Act, a plaintiff must demonstrate that (1) the plaintiff is a person with a disability under the meaning of the statute in question; (2) an employer covered by the statute had notice of his disability; (3) *with reasonable accommodation, plaintiff could perform the essential functions of the job at issue*; and (4) the employer has refused to make such accommodations." *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019) (emphasis added) (internal citations, alterations, and quotation marks omitted). Therefore, DeJoy is entitled to summary judgment on Bibawy's Rehabilitation Act claims.

**D.      Retaliation Claims**

Bibawy also asserts retaliation claims under Title VII and the Rehabilitation Act.

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To assert that an action taken by an employer was retaliatory, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations and quotation marks omitted).

"Retaliation claims under Title VII are evaluated under the *McDonnell Douglas* three-step burden-shifting test." *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005)).  The three steps include the plaintiff's making a prima facie case, the defendant's responding with legitimate non-retaliatory reasons for the adverse employment action, and, finally, the plaintiff's proving retaliation by a preponderance of the evidence.  To satisfy his initial burden of making out a prima facie case of retaliation under Title VII, a plaintiff must show "(1) [ ]he was engaged in protected activity; (2) the employer was aware of that activity; (3) [he] suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (internal citations and quotation marks omitted).

Like Title VII, the Rehabilitation Act proscribes retaliation "for opposing any practice made unlawful by…the Rehabilitation Act…or for participating in any stage of administrative or judicial proceedings under [the Act]." 29 C.F.R. § 1614.101(b).  To establish a prima facie case of retaliation under the Act, a plaintiff must show that "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal citation and quotation marks omitted).  "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id*.

"In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse…action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty*., 252 F.3d 545, 554 (2d Cir. 2001).  The Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation…." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

DeJoy does not dispute that Bibawy engaged in protected activity by filing a complaint with the EEOC and initiating the previous lawsuit.  Bibawy provides no direct evidence for the second element—knowledge of his protected activity—and instead argues that "Meacham's

conduct suggests" she knew of his activity.  Doc. No. 49-1 at 25.  Bibawy also contends, addressing the third and fourth elements of the retaliation claims, that the record evidence "supports at least a de minimus [*sic*] showing that there is a causal connection between [his] engagement in protected activity," filing an EEOC complaint and the related lawsuit, "and the DRAC's failure to identify an accommodation for [him]," the allegedly adverse action.  Doc. No. 49-1 at 30.

Bibawy points to the steps Meacham took or did not take to identify available positions throughout the organization, the manner in which she searched for those positions, and the available positions she ultimately offered him, and argues that this evidence warrants an inference of retaliation.  *See* Doc. 49-1 at 26-30.  For instance, Bibawy cites Meacham's post-DRAC-meeting correspondence, which he contends demonstrates that Meacham "acted in ways designed to achieve a desired outcome, namely, the denial of [his] accommodation request with a superfluous paper trail."  *Id.* at 29.  Specifically, he cites an email in which Meacham requests a (1) database search of "L-04 mail hander [*sic*] positions with fewer than 6 people…and which are within 10 minutes of West Haven," Doc. No. 49-9, Pl. Ex. 6, at 2, and (2) "[a] report that can document no jobs available," as it "would be helpful, especially if it were needed to present to the EEOC."  *Id.* at 3.  From this, he urges me to infer that "Meacham gave direction to conduct the search [to identify jobs for Bibawy] in the most limiting terms possible," Doc. No. 49-1 at 29, and that "Meacham was fully aware of prior protected activity and was processing his request with that information as a top[-]of[-]mind consideration," *id.*  And "the most critical undisputable fact," Bibawy argues, is that Meacham "made no attempts, in either a personal or supervisory role, to identify a reasonable accommodation for the Plaintiff between December 14, 2019 and the closing of the case on March 3, 2020."  *Id.*  Bibawy also vaguely references a "shift

in attitude" in the transition from the injury compensation manager's referral of Bibawy's reasonable accommodation request to the DRAC to its handling by Meacham and the DRAC. *Id.* at 26-27.

None of this evidence, however, suggests retaliatory intent or raises a genuine dispute of material fact about whether there was a causal connection between the alleged adverse action and the protected activity. Aside from a single line in an email in which Meacham appears to be contemplating potential *future* EEOC activity, Bibawy has cited no evidence suggesting that Meacham was even aware of his prior EEOC activity, let alone that it was a motivating factor behind her actions. While the reference to the EEOC could be construed to suggest awareness of prior protected activity when the evidence is viewed in the light most favorable to Bibawy, given the undisputed evidence in the record showing, among other things, that Meacham sent Bibawy several lists of available positions, provided a reasonable explanation as to why the Milford position could not be adjusted to accommodate him, provided him with notice that his case would be closed absent an objection, and explained to him that his case could be reopened if he submitted new information to the DRAC, no reasonable juror could find that Meacham's actions were retaliatory or that the process would have been conducted differently had Meacham been unaware of his prior activity. Even if Bibawy's evidence was enough to satisfy the prima facie case burden, the Defendant has articulated a legitimate, non-retaliatory reason for its actions – that Bibawy was not qualified for the positions offered – and Bibawy has failed to submit evidence suggesting pretext or that the real reason for the Defendant's actions was retaliation. As a result, I grant summary judgment to the Defendant as to the Title VII and Rehabilitation Act retaliation claims.

## V.      CONCLUSION

For the foregoing reasons, DeJoy's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

_____
/s/
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            November 30, 2022